Erin Rose Ronstadt, SBN 028362
Kevin Koelbel, SBN 016599
OBER & PEKAS, PLLC
3030 N. 3rd Street, Suite 1230
Phoenix AZ 85012
Phone: (602) 277-1745
Fax: (602) 761-4443
erin@oberpekas.com
kevin@oberpekas.com

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Shane Balderston, a single man,<br><br>    Plaintiff,<br>v.<br><br>Life Insurance Company of North America,<br><br>    Defendant. | No.<br><br>**COMPLAINT** |

For his claims against Defendant Life Insurance Company of North America ("LINA" or "Defendant"), Plaintiff Shane Balderston ("Mr. Balderston" or "Plaintiff") alleges as follows:

### *Jurisdiction, Venue And Parties*

1.  This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").

2.  Mr. Balderston was a participant and beneficiary of a long-term disability ("LTD") plan (the "Plan") as an employee of Level 3 Communications, LLC.

3.  The Plan is a purported ERISA benefit plan established and maintained by Level 3 Communications for the benefit of its employees.

4.  Level 3 Communications fully insures LTD benefits under the Plan with a Policy, Number LK980182 (the "LTD Policy").

5.  Mr. Balderston is a single man, currently residing in Maricopa County, Arizona and has been a resident of Maricopa County at all times since becoming a Plan participant.

6. At the time Mr. Balderston sought LTD benefits under the Plan, LINA administered claims for Level 3 Communications under the Plan, acted on behalf of the Plan, and acted as an agent for Level 3 Communications.

7. LINA acted as an agent to Level 3 Communications and/or the Plan to make final decisions regarding the payment of disability benefits for the Plan and to administer the Plan.

8. LINA administered claims under the name CIGNA.

9. LINA has its principal place of business in the state of Pennsylvania.

10. LINA is licensed and authorized to do business in Maricopa County, Arizona, and resides and is found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

11. This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

12. Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

13. Mr. Balderston is informed and believes that LINA does not have discretionary authority under the Plan.

14. Because discretionary authority has not been delegated to LINA, LINA should not be entitled to any deference in its decision-making in light of the facts and circumstances of this claim.

15. Mr. Balderston is entitled to *de novo* review of his claim.

## GENERAL ALLEGATIONS

### *LTD Plan Language*

16. In order to meet the definition of Disability under the LTD Policy, Mr. Balderston must be "unable to perform the material duties of [his] Regular Occupation; and unable to earn 80% or more of [his] Indexed Earnings from working in [his] Regular Occupation," "solely because of Injury or Sickness."

17. In order to meet the definition of Disability under the LTD Policy after Disability Benefits have been payable for 24 months, Mr. Balderston must prove that "solely because of Injury of Sickness" he is "unable to perform the material duties of any occupation for which [he] is, or may reasonably become, qualified based on education, training, or experience," and "unable to earn 80% or more of [his] Indexed Earnings.

18. The LTD Policy defines "Indexed Earnings" as follows:

> For the first 12 months Monthly Benefits are payable. Indexed Earnings will be equal to Covered Earnings. After 12 Monthly Benefits are payable. Indexed Earnings will be an Employee's Covered Earnings plus an increase applied on each anniversary of the date Monthly Benefits became payable. The amount of each increase will be the lesser of:
>
> 1. 10% of the Employee's Indexed Earnings during the preceding year of Disability; or
>
> 2. the rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

19. The LTD Policy defines "Sickness" as "[a]ny physical or mental illness."

20. The LTD Policy defines "Injury" as "[a]ny accidental loss or bodily harm which results directly and independently of all other causes from an Accident."

21. The LTD Plan defines Regular Occupation as "[t]he occupation [Mr. Balderston] routinely perform[ed] at the time the Disability begins. In evaluating the Disability, [LINA] will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location."

*Mr. Balderston's Employment*

22. Level 3 Communications employed Mr. Balderston as a Senior IT Project Manager.

23. Mr. Balderston initially went out of work on August 29, 2014.

24. Mr. Balderston returned to work from April 7, 2015 to April 21, 2015. Because of worsening medical issues, he did not return to work after that.

25. The material duties of Senior IT Project Manager based on Level 3 Communications' job description include the following:

-3-

- Advised business stakeholders on optimal scope, phasing and delivery options;
- Develops and proposed high-level functional architecture;
- Solicits and gathers detailed business requirements;
- Validates systems requirements against business requirements;
- Demonstrated subject-matter expertise in assigned area(s);
- Understands and explains business drives and balances those with solution options;
- Estimates high-level effort for programs – analysis, design, development and testing;
- Leads and guides development teams through program completion and rollout;
- Facilitates communication of scope and outcome of program to executive-level business stakeholders;
- Creates the Concept of Operations/Vision documents.

26. According to Level 3 Communication's job description, Mr. Balderston's occupation as a Senior IT Project Manager required the following physical and cognitive demands:

- Ability to sit five to seven hours per day;
- Ability to stand or walk one to three hours per day;
- Ability to bend, reach, stoop and crouch throughout the day;
- Ability to lift and/or move up to 10 pounds;
- Ability to hear, speak and see effectively to perform the necessary tasks of the position;
- Ability to use keyboards and to view data on computer displays; and
- Ability to communicated verbally and in writing to the needs of others

### *Mr. Balderston's Disability*

27. In 2014, Mr. Balderston was hospitalized for a severe, antibiotic resistant cellulitis infection in his right leg. Mr. Balderston spent several months in and out of the hospital fighting the infection. He underwent a long course of antibiotic therapy.

28. While hospitalized, the infection worsened requiring antibiotics to be administered through a peripherally inserted central catheter ("PICC") line. Mr. Balderson

-4-

experienced a severe complication, thrombosis, from the insertion of the PICC line. As a result, the PICC line was discontinued and a central line was placed to administer further medication.

29. After that, Mr. Balderston underwent extensive medical work-up for his blood clots. During his work-up, several issues were identified. A CT scan of his neck revealed internal jugular vein thrombosis or an occlusion/clot in his right internal jugular vein. Mr. Balderston was also determined to have styloidogenic jugular venous compression syndrome.

30. Mr. Balderston suffers from chronic and debilitating occular headaches and visual disturbances, which are consistent with the diagnoses in the preceding paragraph.

31. Mr. Balderston also suffers from other medical issues including, but not limited to, cervical spine degenerative disc disease, chronic pain syndrome, polyarthralgia, osteoarthritis, irritable bowel syndrome, and chronic foot and ankle pain following multiple surgical ligamentous repair.

32. Mr. Balderston's diagnoses are substantiated by objective evidence, including diagnostic imaging and physical examination findings.

33. Mr. Balderston experiences cognitive difficulties secondary to his pain.

34. Mr. Balderston's ability to seek more aggressive treatment is stunted by his lack of income since LINA's termination of his LTD benefits.

### *Mr. Balderston's LTD Benefits*

35. On April 1, 2015, LINA approved Mr. Balderston's LTD claim. LINA approved the claim based on Mr. Balderston's history of blood clots and recent hospital admissions.

36. LINA issued Mr. Balderston's first benefits check in the amount of $4,454, which covered the period, February 28, 2015 through March 27, 2015.

37. A couple weeks after his claim had been approved, Mr. Balderston notified LINA that he had persuaded his physician, Dr. Woods, to release him back to work. Despite his best intentions, Mr. Balderston had difficulty managing his work hours. He

communicated this to LINA.

38. Based on his return to work, LINA closed Mr. Balderston's claim effective April 5, 2015.

39. Mr. Balderston returned to his employment from April 7, 2015 to April 21, 2015 until he was hospitalized again on April 21, 2015 for worsening headaches and neck pain.

40. Mr. Balderston was re-admitted to the hospital again in May 2015 and underwent further testing. Mr. Balderston notified LINA of his hospital admissions in April and May 2015.

41. Based on his hospital admissions, diagnosis of styloidogenic jugular venous compression syndrome, history of clots, cellulitis, swelling in his upper and lower extremities, and ongoing evaluation, LINA determined that the medical evidence continued to support Mr. Balderston's Disability from his Regular Occupation.

42. On May 20, 2015, LINA reopened Mr. Balderston's LTD claim.

43. LINA continued to monitor Mr. Balderston's claim, and on December 2, 2015, notified Mr. Balderston that it was referring him for an Independent Medical Examination ("IME").

44. LINA employed MES Solutions ("MES") to coordinate the IME.

45. Mr. Balderston attended the IME on February 19, 2016. The IME was performed by Dr. Scott Krasner.

46. In his report, Dr. Krasner noted that Mr. Balderston appeared cooperative throughout the exam. He opined that "[g]iven his history, continued symptomatology, use of medications, and findings on exam, Mr. Balderston [had] moderate effects on his functional capabilities." Despite this conclusion, Dr. Krasner concluded that Mr. Balderston was capable of sitting constantly.

47. LINA reviewed Dr. Krasner's IME report on February 29, 2016. No actions were made on Mr. Balderston's claim on the basis of Dr. Krasner's report.

48. On November 28, 2016, LINA advised Mr. Balderston that it was initiating

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

an Any Occupation investigation under the LTD Policy. LINA notified Mr. Balderston that further testing might be needed. Mr. Balderston reminded LINA that he had undergone an IME earlier that year.

49. LINA scheduled another IME for Mr. Balderston. Due to circumstances beyond Mr. Balderston's control, the IME was rescheduled several times.

50. LINA employed Exam Coordinators Network ("ECN") to coordinate the IME and received a 5% discount off the final report.

51. Mr. Balderston underwent a second IME on March 3, 2017 with Dr. Brian McCrary.

52. Dr. McCrary completed a Physical Ability Assessment for LINA and determined that based on his exam of Mr. Balderston, he was capable of sitting constantly or more than five and a half hours a day. He also noted that Mr. Balderston could frequently stand, walk and/or reach.

53. Dr. McCrary has a demonstrated record of bias against disability claimants. Mr. Balderston is informed and believes that Dr. McCrary derives a substantial portion of his income from performing IMEs.

54. On information and belief, Dr. McCrary has performed over 900 IME reviews and has testified or been deposed over 125 times. *See* https://www.imenet.com/content/imedir.pdf.

55. In his report, Dr. McCrary was openly adversarial and distrustful of Mr. Balderston stating, "There was some tenderness to palpation of the lateral neck, which he expressed only when I specifically asked him. He did not express any discomfort when he was distracted."

56. Out of all of the physicians who have evaluated Mr. Balderston, no one but Dr. McCrary, has ever insinuated or implied that Mr. Balderston is malingering or otherwise exaggerating his symptoms. Mr. Balderston's providers have never found any reason to find his symptoms less than credible.

57. Dr. McCrary is not qualified to comment on Mr. Balderston's conditions and

lacks the appropriate training and medical experience. According to his SEAK profile (https://www.imenet.com/content/imedir.pdf), Dr. McCrary's specialty focus is: "Occupational Medicine, Toxicology – Medical Toxicology, Causation analysis, Musculoskeletal Injury, Wound Care, Hyperbaric Medicine, Diving Medicine, Osteopathy, Impairment rating, Toxicology, Aerospace Medicine, Aviation Medicine, Disability claims, FMLA, Return to work, Long term disability, Second opinions and peer reviews, Fitness for duty evaluation."

58. Prior to the second IME, LINA documented the details of its "AO Investigation." It noted that Mr. Balderston continued to have symptoms and was undergoing appropriate treatment. LINA also noted that Mr. Balderston had less than sedentary capacity stating that his functional abilities were "less than [his] own occ," which LINA had previously identified as a sedentary occupation.

59. Dr. McCrary's opinion is contrary to LINA's prior assessment of functional capacity, as LINA found restrictions and limitations precluding Mr. Balderston's ability to work in his Regular Occupation, a sedentary occupation.

60. On March 10, 2017, LINA reviewed Dr. McCrary's IME report.

61. LINA referred the claim to an internal vocational rehabilitation counselor for a Transferable Skills Analysis ("TSA"). Instruction was made for the TSA to be performed based off of Dr. McCrary's report.

62. Based on the restrictions and limitations set forth by Dr. McCrary, LINA determined as part of its TSA that Mr. Balderston had the "reasonable functional capacity" to perform two occupations: Manager, Computer Operations and Project Manager. The TSA noted that Manager, Computer Operations was "Customer's own occupation."

63. LINA terminated Mr. Balderston's claim on March 16, 2017 and issued a formal denial letter addressed to Mr. Balderston that day.

64. The March 16, 2017 denial letter (the "Denial Letter") proffered little insight into the reasons for the denial. It was devoid of any meaningful discussion of the medical evidence. Instead, LINA provided the following rationale for its decision:

> Based on the Independent Medical Evaluation performed March 3, 2017, it was determined that you are capable of performing a sedentary occupation…
>
> We then referred your claim to our vocational department for review for a Transferable Skills Analysis. They considered your work capacity, restrictions and limitations, along with your education and employment history, to determine occupations that would be able to perform based on your current work experience.
>
> This review confirmed that you would be able to perform the following occupations:
> -- Manager, Computer Operations – 169.167-082
> -- Project Manager – 189.17-030
>
> The above identified occupations are compatible with your work capacity. Additionally, all of the jobs listed above satisfy the earnings requirement for your Indexed Covered Earnings under the contract.
>
> At this time, you no longer meet the definition of Disability stated above and your claim has been closed. Payments have been made through March 16, 2017 and no further benefits are due.

65. Despite mentioning the IME, LINA did not discuss or reveal any of the IME findings in the Denial Letter.

66. On June 23, 2017, LINA received Mr. Balderston's appeal letter. Because the medical records in Mr. Balderston's file were not current, LINA provided Mr. Balderston with additional time to submit more recent records.

67. While his appeal was pending, Mr. Balderston's health deteriorated. He was admitted to an assistive living facility.

68. Mr. Balderston retained counsel to assist with his appeal submission.

69. Mr. Balderston's counsel notified LINA of her representation and requested a 90-day extension to submit supplemental information in support of Mr. Balderston's appeal.

70. Counsel was presented with the option of withdrawing Mr. Balderston's appeal and resubmitting it by January 15, 2018. Counsel agreed to this arrangement on the condition that any applicable statute of limitations would be tolled while the appeal was pending submission. LINA agreed to remove his appeal from review and toll the deadline for appeal until January 15, 2018.

71. Out of an abundance of caution, Mr. Balderston filed this lawsuit before exhausting the administrative appeal process because the contractual limitation period to commence a lawsuit may expire before the administrative appeal process is exhausted. *See Heimeshoff v. Hartford Life & Acc. Ins. Co,* 134 S.Ct. 604, 610 (2013) (rejecting argument that a limitations provision cannot commence before accrual of the cause action.)

**COUNT I**
**(Recovery of LTD Plan Benefits)**
**(Defendants LINA and the LTD Plan)**

72. All other paragraphs are incorporated by reference.

73. The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.

74. The Plan represents LTD coverage and a promise to provide LTD benefits until Mr. Balderston is no longer Disabled under the terms of the Plan.

75. Mr. Balderston continues to be Disabled. He is unable to perform the material and substantial duties of any occupation for which he is qualified by training, education, or experience and provides 80% or more of his Indexed Earnings.

76. Mr. Balderston has claimed the benefits under the Plan to which he is entitled.

77. Mr. Balderston reasonably expected that his medical conditions met the requirements of Disability as defined by the Plan, and that he would receive benefits under the Plan until he reached 65 or until he was no longer disabled.

78. Despite the coverage of Mr. Balderston's Disability, LINA improperly terminated his LTD benefits in breach of the Plan and ERISA.

79. LINA's collective conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and clearly erroneous.

80. Even if discretionary authority was properly delegated to LINA, in light of LINA's wholesale and flagrant procedural violations of ERISA, Mr. Balderston should be entitled to *de novo* review. *See Halo v. Yale Health Plan,* 819 F.3d 42, 60-61 (2d Cir. 2016) ("when denying a claim for benefits, a plan's failure to comply with the Department of

-10-

Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless.")

81. Instead of evaluating a participant's eligibility based on the applicable plan language and medical evidence, Mr. Balderston is informed and believes that LINA makes claims decisions based on the claims resources and financial risk it faces on certain claims.

82. LINA wrongfully denied Mr. Balderston's disability benefits without providing a coherent explanation for its denial, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

83. LINA did not properly consider all of the available evidence when terminating Mr. Balderston's benefits.

84. LINA failed to conduct a full and fair review.

85. LINA blatantly misstated medical evidence for its own financial benefit, *e.g.,* it overstated and excessively relied on biased medical reviews.

86. LINA relied on findings that constitute "clearly erroneous findings of fact" to deny Mr. Balderston's benefits.

87. LINA abused its discretion by basing its decision on unreliable and inaccurate information. When confronted with this knowledge, LINA either ignored the inaccuracies or corrected the inaccuracies and created new reasons for denial.

88. Upon information and belief, LINA tainted its IME reviewers by giving the reviewers inaccurate information regarding Mr. Balderston, while also failing to provide its reviewers with all of the relevant evidence.

89. Upon information and belief, LINA provided its reviewers and vendors with internal notes and financial information about the claim, compromising their ability to make "independent" medical determinations and creating further bias in reviews.

90. LINA routinely emphasizes information that favors a denial of benefits while deemphasizing other information that suggests a contrary conclusion.

91. LINA failed to properly consider all of the medical evidence.

92. In terminating Mr. Balderston's LTD benefits, LINA completely disregarded evidence that his conditions had not changed or improved.

93. LINA has no evidence that Mr. Balderston's conditions changed or improved since it determined that he met the definition of Disabled in the LTD Policy.

94. The IME reviewers arbitrarily reached their opinions based on insufficient evidence or investigation.

95. The IME reviewers were not given the Plan or other important records for reaching its decision that Mr. Balderston could perform work.

96. LINA engaged in other procedural irregularities, which it did to serve its own financial best interests.

97. On information and belief, LINA engaged in claim discussions to decide the directions of appeals without having reviewed all of the medical evidence, demonstrating its predetermined path of terminating benefits.

98. LINA intentionally gathered evidence to stack the deck in its favor and against Mr. Balderston.

99. Mr. Balderston alleges upon information and belief that LINA has a parsimonious claims handling history.

100. LINA failed to conduct a "meaningful dialogue" regarding Mr. Balderston's claim.

101. Under the *de novo* standard of review, Mr. Balderston need only prove by a preponderance of the evidence that he is disabled to be entitled to benefits.

102. Even under the abuse of discretion standard of review, LINA abused its discretion, because its decision terminating Mr. Balderston's disability benefits was arbitrary and capricious and was caused or influenced by LINA, its reviewing physicians, and its vendors' financial conflicts of interest. These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

103. Mr. Balderston is entitled to discovery regarding the effects of the procedural

irregularities and structural conflict of interest that infiltrated the claims handling process and also regarding the effects of LINA's reviewing physicians', its employees', and its vendors' financial conflicts of interest, biases, and motivations on the decision terminating Mr. Balderston's LTD claim.

104. Under the *de novo* standard of review, Mr. Balderston is entitled to discovery regarding, among other things, the credibility of LINA's medical reviews and LINA's lack of partiality due to its financial conflicts of interest. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (under the *de novo* standard of review, new evidence may be admitted regarding, among other things: "the credibility of medical experts… [and] instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (*quoting Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993))).

105. Pursuant to the coverage provided in the LTD Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal law, Mr. Balderston is entitled to recover all benefits due under the terms of the Plan, and to enforce his rights under the Plan.

106. Mr. Balderston is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of his disability benefits. He is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

107. Pursuant to 29 U.S.C. § 1132(g), Mr. Balderston is entitled to recover his attorneys' fees and costs incurred herein from LINA.

108. Mr. Balderston is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid.

**COUNT II**
**(Breach of Fiduciary Duty)**
**(LINA)**

109. All other paragraphs are incorporated by reference.

110. Under 29 U.S.C. § 1132(a)(3), this Court may enjoin any act or practice that violates ERISA or the terms of the Plan, as well as grant other appropriate equitable relief,

1  provided that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

2      111.    LINA is a fiduciary and owes fiduciary duties to Plan participants, including
3  Mr. Balderston.

4      112.    Under 29 U.S.C. § 1104(a), LINA is required to discharge its duties with the
5  care, skill, prudence, and diligence under the circumstances that a prudent man acting in like
6  capacity and familiar with such matters would use under 29 U.S.C. § 1104(a).

7      113.    Under ERISA, which is founded in trust principles, LINA is required to
8  administer claims in the *best interests* of beneficiaries and participants as part of its fiduciary
9  duty.

10      114.    In multiple ways throughout the administration of Mr. Balderston's claim,
11  LINA breached its fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3).

12      115.    LINA's arbitrary and capricious claims handling generally constitutes a breach
13  of fiduciary duty, because LINA's claims handling was discharged imprudently and caused
14  Mr. Balderston harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B).

15      116.    LINA's actions have caused Mr. Balderston serious harm.

16      117.    Moreover, Mr. Balderston now owes significant attorneys' fees because of
17  LINA's breaching conduct.

18      118.    By unreasonably denying Mr. Balderston's benefits, LINA breached its
19  fiduciary duties. To the extent that LINA's denial of benefits caused Mr. Balderston harm
20  unrecoverable under 29 U.S.C. § 1132(a)(1)(B), then that harm is recoverable under 29
21  U.S.C. § 1132(a)(3).

22      119.    On information and belief, LINA instructs and/or incentivizes certain
23  employee(s) to terminate fully insured LTD claims and appeals based on bias or its financial
24  interests.

25      120.    Mr. Balderston is informed and believes that LINA's employees are trained in
26  administering claims in the best interests of LINA, not Plan participants. LINA
27  demonstrated bias and malice against Mr. Balderston through its employees. Instead of fully
28  and fairly reviewing the medical evidence, LINA unreasonably denied Mr. Balderston's

claim based on unreliable evidence.

121. LINA's failure to act prudently and in the best interests of Mr. Balderston is a breach of fiduciary duty requiring appropriate equitable relief following discovery of LINA's conduct as it relates to Mr. Balderston's claim.

122. Mr. Balderston is informed and believes that LINA has targeted claims under the LTD Plan, including Mr. Balderston's, which is a breach of fiduciary duty.

123. On information and belief, LINA breached its fiduciary duty to Mr. Balderston by terminating his claim in an effort to avoid its financial liability.

124. Based on the facts of this case, Mr. Balderston has "other equitable relief" available to him in several forms, including but not limited to surcharge,[1] because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Mr. Balderston whole for his losses from LINA's breaching conduct.

125. The Court has broad discretion to fashion appropriate relief to make Mr. Balderston whole and should mold the relief necessary to protect the rights of the participants.

126. Mr. Balderston is entitled to injunctive or mandamus relief under 29 U.S.C. § 1132(a)(3).

127. He is entitled to enjoin any act or practice by LINA that violates ERISA or the Plan, or seek other appropriate equitable relief that is traditionally available in equity.

128. LINA was unjustly enriched as a result of its breach of fiduciary duty violations, because it wrongfully withheld Mr. Balderston's benefits for its own profit.

129. LINA engaged in several procedural violations in an attempt to circumvent its obligations under ERISA, and these violations are by definition under 29 U.S.C. § 1132(a)(3) conduct that can be enjoined by this Court.

130. LINA acted with malice and in bad faith against Mr. Balderston, which

---

[1] A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

constitutes a violation of its fiduciary obligations.

131. ERISA "does not elsewhere adequately remedy" the injuries caused to Mr. Balderston by LINA's breach of fiduciary duty violations.

132. As a direct and proximate result of the breaches of fiduciary duty, Mr. Balderston suffered actual, *significant* financial harm and has incurred financial expense.

133. Mr. Balderston is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid in full.

134. Pursuant to 29 U.S.C. § 1132(g), Mr. Balderston is entitled to recover his attorneys' fees and costs incurred herein from LINA.

**WHEREFORE**, on all claims, Mr. Balderston prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A. All past LTD benefits under the terms of the LTD Plan;

B. Clarifying and determining Mr. Balderston's rights to future benefits under the terms of the LTD Plan;

C. For any other benefits Mr. Balderston may be entitled to receive under the LTD Plan due to his disability;

D. All other equitable relief that is proper as a result of LINA's breaches of fiduciary duties;

E. An award of Mr. Balderston's attorneys' fees and costs incurred herein;

F. An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

G. For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 30th day of November 2017.

OBER & PEKAS, PLLC

By: *s/ Kevin Koelbel*
    Erin Rose Ronstadt
    Kevin Koelbel
    *Attorneys for Plaintiff*